**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SALLY ORR, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br>vs.<br><br>BURBERRY LIMITED, a New York corporation; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No.  1:26-cv-05020<br><br>**CLASS ACTION COMPLAINT FOR (1) USE OF A TRAP AND TRACE DEVICE IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CAL. PENAL CODE § 638.51); (2) INTRUSION UPON SECLUSION** |

## I.   INTRODUCTION

1.      Plaintiff Sally Orr ("Plaintiff"), on her behalf and on behalf of a class of similarly situated persons, brings this action against Defendant Burberry Limited ("Defendant" or "Burberry").  Burberry operates a website, located at www.burberry.com (the "Website"), to sell luxury clothes and goods for delivery to individuals in California, and, more generally to market the brand Burberry.

2.      Burberry has been an active and pioneering advertiser on the TikTok social media and advertising platform since 2019.  Burberry's paid campaigns on TikTok are designed to drive audiences to burberry.com.

3.      Defendant installed, has used, and currently uses software owned by TikTok on the Website to collect and transmit to TikTok scores of data points about a visitor, her browser and her computer.  The purpose of this software (the "TikTok Software") is to identify the visitor so that she can be targeted with marketing based on data about her. This is performed without visitors' consent or any court order, for Defendant's and TikTok's financial and commercial benefit.

4.      Plaintiff visited the Website on August 24, 2025 from a location in California. Without Plaintiff's knowledge or consent, Defendant deployed a de-anonymization process to identify Plaintiff using incoming electronic impulses generated from Plaintiff's device, as further described herein.  The same happened with an untold number of persons visiting the Website from

1

California.

## II.    JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. ¬ß 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class.  Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

6.    This Court has general personal jurisdiction over Defendant because Defendant is incorporated in New York and maintains its principal place of business in New York, New York.

7.    Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 because Defendant resides in this District, where it is headquartered.

## III.    PARTIES

8.    Plaintiff Sally Orr is a California resident. Plaintiff maintains reasonable expectations of privacy when browsing websites. Defendant systematically violated these expectations through its unauthorized surveillance activities when she landed on the Website.

9.    Defendant Burberry is a purveyor of luxury goods including clothing.

10.    DOE Defendants 1 through 10 are unknown entities that Defendant directed and controlled to participate in implementing or maintaining Defendant's surveillance system. Plaintiff will seek leave to amend this Complaint to identify these entities when Defendant's discovery responses reveal their true names and roles.

11.    Each DOE Defendant acted as Defendant's agent or employee in Defendant's implementation of the surveillance scheme described herein. Each DOE Defendant operated within the scope of its relationship with Defendant and participated with Defendant in the common plan to unlawfully track California residents for Defendant's commercial gain.

## IV.    CALIFORNIA'S TRAP AND TRACE LAW, CIPA,
## CAL. PENAL CODE §§ 638.50-51

12.    California Penal Code § 638.50(c) defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number

2

or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."

13.    California Penal Code § 638.51(a) provides (in relevant part) that, except as provided in subdivision (b), "a person may not install or use [ ] a trap and trace device without first obtaining a court order" pursuant to specified provisions.

14.    California's Invasion of Privacy Act, Cal. Penal Code §§ 630 *et seq.,* was enacted in 1967.  The first statute in the act, § 630, explains:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.  The Legislature by this chapter intends to protect the right of privacy of the people of this state.

15.    In 1986, Congress enacted the Electronic Communications Privacy Act, which includes a prohibition on the use of a trap and trace device "without first obtaining a court order under section 3123 of this title, or under the Foreign Intelligence Surveillance Act of 1978…". Pub. L. 99–508, title III, § 301(a), 100 Stat. 1868 (Oct. 21, 1986).  At the opening of a September 26, 1985 hearing of the U.S. House of Representatives Subcommittee on Courts, Civil Liberties, and the Administration of Justice of the Committee on the Judiciary, on the Electronic Communications Privacy Act, the Chairman of the Subcommittee, Representative Robert W. Kastenmeier explained (emphasis added):

> This morning we begin a series of hearings on H.R. 3378, the Electronic Communications Privacy Act of 1985. [ . . . ] When Congress passed the wiretap law in 1968, there was a clear consensus that telephone calls should be private. Earlier Congresses

had reached that same consensus regarding mail and telegrams. But in the almost 20 years since Congress last addressed the issue of privacy of communications in a comprehensive fashion, the technologies of communication and interception have changed dramatically. Today we have large-scale electronic mail operations, cellular and cordless telephones, paging devices, miniaturized transmitters for radio surveillance, lightweight compact television cameras for video surveillance, and *a dazzling array of digitized information networks* which were little more than concepts two decades ago. These new modes of communication have outstripped the legal protection provided under statutory definitions bound by old technologies. The unfortunate result is that the same technologies that hold such promise for the future also enhance the risk that our communications will be intercepted by either private parties or the Government. Virtually every day the press reports on the unauthorized interception of electronic communications ranging from electronic mail and cellular telephones *to data transmissions between computers*.

Congress needs to act to ensure that the new technological equivalents of telephone calls, telegrams, and mail are afforded the same protection provided to conventional communications. It is my hope that in the weeks and months ahead the affected parties will work with the subcommittee in the spirit of cooperation and compromise to forge a bill which meets this urgent problem.

16. California's Trap and Trace law, codified at Cal. Penal Code §§ 638.50-51, was enacted as AB 929 on August 13, 2015.

17. The definition of a "trap and trace device" set forth in § 638.50(c) derives mostly from the definition of "trap and trace device" used in applying federal privacy statutes, set forth in

18 U.S. Code § 3127(4), as amended *in 2001*. The federal definition reads: "the term "trap and trace device" means a device or process which captures the incoming electronic or other impulses which identify the originating number or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication, provided, however, that such information shall not include the contents of any communication; . . ." 18 U.S. Code § 3127(4).

18.    On October 26, 2001, when the Internet, websites and tracking software existed, Congress amended the federal definition previously set forth in 18 U.S. Code § 3127(4) to insert the following words: "or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication, provided, however, that such information shall not include the contents of any communication;". Pub. Law 107-56, 115 STAT 290 (2001).

## V.    FACTUAL ALLEGATIONS

### A.    Defendant's Deliberate Implementation of TikTok Software.

19.    Defendant owns, operates, and exercises absolute control over the Website. Defendant makes all decisions regarding the Website's technical infrastructure, embedded technologies, and data collection practices.

20.    Defendant chose to embed the TikTok Software in its Website to enable TikTok to systematically identify and track Website visitors. Defendant made this decision to gain access to detailed visitor identification data and enhanced advertising/retargeting capabilities provided by TikTok. Defendant knew or should have known that this arrangement was designed to circumvent user privacy expectations, including those of Plaintiff, and to sidestep consent.

21.    By the time a user accesses the Website, the TikTok Software has already commenced collecting data from the user. Upon Plaintiff's visit, the TikTok Software immediately began (during initial page load) collecting Plaintiff's identifying information and transmitting it to TikTok without Plaintiff's knowledge, awareness, or consent.

### B.    Identification of Individuals by Non-Personal Data – Digital "Fingerprinting"

22.    Why does it matter that data about a Website visitor such as the size of her screen,

her device's brand name and her browser settings get transmitted to TikTok?  One would think that the sharing of such seemingly non-personal data cannot impact a visitor's life or experience. This assumption is simply incorrect.

23.    Moreover, a website operator needs information about the devices and browsers of visitors to its website to properly render the website on visitors' screens and devices.  It requires things like screen size and color configurations.  ***This action is not about Defendant's collection of such non-descript data to run the Website.***  First, it is about the transmission of the seemingly non-personal information to third parties – in this case, TikTok.  Second, such data is accompanied with information about the visitor's location and the "referrer URL" – the page the visitor was on before she navigated to the website transmitting data to TikTok.  (It may also be accompanied by alphanumeric strings or "identifiers" that have already been associated with a visitor that TikTok software on websites recognize.  Such identifiers are stored on cookies.)

24.    The fact is that when you visit a website, ***and before you get to weigh in on whether you should be targeted with ads or identified***, scores of non-personal data points tell social media/advertising platforms like TikTok who you are. This data is *sometimes* combined with information already in the hands of social media including your name and email addresses, as well as other websites you have visited in the past.  TikTok maintains a database containing information about hundreds of millions of Americans, including those that are not TikTok subscribers.

25.    Examples of such data points are:

- Device type and configuration
- Browser type and version
- Operating system and version
- Screen resolution and color depth
- System language settings
- Time zone settings
- Installed fonts
- Installed browser plugins or extensions
- Device memory

- CPU class

- Canvas rendering characteristics

- WebGL rendering characteristics

- AudioContext processing characteristics

- Touch support and input capabilities

- Network connection type

26. As explained in an article in the October 2025 issue of *Wired Magazine*:

Your browser fingerprint is a collection of innocuous information about your PC that, ***when put together, is unique enough that it could identify an individual***. Some of the components of your browser fingerprint include your computer's hardware, your browser and version, the various versions of software you have running in your browser, the fonts you have installed on your PC, your time zone, your system language, your keyboard layout; the list goes on. Out of the dozens of pieces of information, none of them could identify you individually. It's when this data is bundled together that your fingerprint becomes unique.[1]

27. The fingerprinting process works even when a visitor does not enter any items *colloquially referred to* as "personal data" – such as name, telephone number, address or email address – into a website.

28. In 2025, researchers at U.S. universities found evidence of the use of browser fingerprinting by websites, particularly in connection with advertising.[2]   Through research, Dr. Yinzhi Cao, Associate Professor of Computer Science and Technical Director of the Information

---

[1] Jacob Roach, "Here's What Your Browser Is Telling Everyone About You: Your browser sends a lot of information with each website you visit. That can be used to track you across the internet." (Wired Magazine, Oct. 16, 2025), available at https://www.wired.com/story/what-is-browser-fingerprinting/ (last viewed 2/22/2026).

[2] Texas A&M Univ. Dep't of Computer Science and Engineering, "Websites Are Tracking You Via Browser Fingerprinting: New research provides the first evidence of the use of browser fingerprints for online tracking." (Texas A&M Stories June 26, 2025), available at https://stories.tamu.edu/news/2025/06/26/websites-are-tracking-you-via-browser-fingerprinting/ (last viewed 2/22/2026).

Continued on the next page

Security Institute at Johns Hopkins University, and other scholars, have "correlate[d] browser fingerprints and ad behaviors, essentially establishing the relationship between web tracking and fingerprinting."[3]

### C.     The Cycle of Third-Party Collection of Consumer Data and the Tracking of Consumers

29.     Collection of visitor data by entities such as TikTok – including collection by these entities of unique identifiers that the TikTok Software assigns to visitors to the websites of advertising companies like Defendant – enables ongoing tracking of website visitors as they visit new websites in the future.  At the same time, the tracking of a person's internet browsing going forward provides more opportunities for data collection (and profile building) about an individual. This cycle aids the advertising and/or data monetization efforts of TikTok and other social media companies.

30.     As California Attorney General Rob Bonta explained in a 2022 California Superior Court complaint filed against retailer/website operator Sephora USA, Inc. (emphasis added):

> Consumers are constantly tracked when they go online. Sephora, like many online retailers, allows ***third-party companies*** to install tracking software on its website and in its app so that these third parties can monitor consumers as they shop. The third parties track all types of data; in Sephora's case, third parties can track whether a consumer is using a MacBook or a Dell, the brand of eyeliner that a consumer puts in their "shopping cart," and even the precise location of the consumer. Some of these third-party companies create entire profiles of users who visit Sephora's website, which the third parties then use for Sephora's benefit. For example, the third party might provide detailed analytics information about Sephora's customers and provide that to Sephora, or offer Sephora the opportunity to purchase online ads targeting specific consumers [ . . . ]. This data

---

[3] *Id.*

8

about consumers is frequently kept by companies and used for the

benefit of other businesses, without the knowledge or consent of the

consumer.

Complaint, *People of the State of California v. Sephora USA, Inc.*, CGC-22-601380, 2022 CA Sup. Ct. Pleadings LEXIS 38450 (Cal. Super. Ct., San Francisco Co., Aug. 24, 2022) (the "*Sephora Complaint*"), at 2:2-13.

### D.    The TikTok Software

31.    Defendant installed and configured the TikTok Software on its Website to enable covert identification, tracking, and profiling of unsuspecting visitors by TikTok for Defendant's benefit, all without visitors' knowledge or consent.

32.    The TikTok Software gathers device and browser information, geographic information, referral tracking, and URL tracking by running code or "scripts" on the Website to send visitor details, including Plaintiff's information, to TikTok.  It also gathers and transmits to TikTok a visitor's navigation on the Website, moving from webpage to webpage, based on the URLs of the webpages.

33.    The TikTok Software on the Website begins operating upon a visitor while the page on the Website she is navigating to is loading on the visitor's screen.  This occurs before the visitor has any meaningful opportunity to interact with any consent mechanism, or banner, appearing on the Website. The TikTok Software transmits instructions to visitors' web browsers.

34.    The TikTok Software harnesses digital fingerprinting to identify visitors to the Website, matching new data it receives during a visit regarding a Website visitor's device and browser, and activities on the Website, with data about the visitor already in TikTok's possession.

35.    On her visit to the Website on August 24, 2025, Plaintiff was subjected to the TikTok Software as described *supra*.

36.    The operation of the TikTok Software on a page of the Website is shown in the screenshot below, taken using Google Chrome's developer tools "network activity" resource, around the time of Plaintiff's visit to the Website:[4]

---

[4] The images included in this Complaint were not created by Plaintiff herself or in connection with her visit to the Website.



37.     The transfer of visitor data from Defendant's Website to TikTok is shown in the screenshot below:



38.     Cross-site individual tracking is a primary purpose of the TikTok Software – enabling TikTok to build behavioral profiles on people across the internet whether or not they are TikTok users.  Because TikTok code is embedded in millions of websites (including the sites of

media publishers and government agencies), the ongoing surveillance opportunities respecting visitors to Defendant's Website are extensive.

39.    Defendant operated and continues to operate TikTok Software on all Website visitors, including Plaintiff, without obtaining their prior consent – regardless of whether visitors maintain TikTok accounts, have ever used TikTok services, or have consented to cross-site tracking.

40.    On information and belief, the operation of the TikTok Software caused Plaintiff to be identified to TikTok to a reasonably likely extent, and enabled TikTok to track Plaintiff on a future basis as she visited websites on the internet also deploying the TikTok Software.

E.    **The TikTok Software Deployed on Defendant's Website Constitutes an Unlawful Trap and Trace Device.**

41.    The TikTok Software, as installed and deployed by Defendant, is thus reasonably likely to identify visitors, their devices and their browsers as the "sources" of the visitors' interaction with the Website during their visits.

42.    Defendant never obtained Plaintiff's informed consent (or that of other visitors from California similarly situated to Plaintiff) before Defendant installed the TikTok Software on its Website, or used it, while Plaintiff (and such visitors) visited the Website. Defendant deliberately concealed the operation of this tracking software from Website visitors, including Plaintiff. It programmed its Website to begin surveillance before visitors, including Plaintiff, could meaningfully consent to or prevent it.

F.    **Plaintiff's Data and Related Profiles of Consumers Have Economic Value.**

43.    TikTok is an advertising juggernaut. It earns tens of billions in advertising revenue per year. To accomplish this, it must collect tremendous amounts of data from individuals browsing the Internet, and identifying them and compiling their activities, traits, characteristics and proclivities.

44.    The type of visitor data transmitted via the Website through the TikTok Software has economic value, as it is clear from the fact that Defendant installed the Software on the Website, and TikTok developed the Software in the first place. The value of this data was

11

diminished by Defendant's deployment of the TikTok Software on the Website.

45.    The loss of anonymity that occurs through the type of visitor browser fingerprinting by the TikTok Software and subsequent tracking alleged herein imposes real costs on visitors to Defendant's Website, including Plaintiff. For example, in 2025, the Federal Trade Commission found that many websites use data such as "consumers' characteristics and behaviors, like location, demographics, browsing patterns, and shopping history" to tailor consumer pricing.[5]

46.    As recently explained by the Law Institute:

In the modern economy, identity information has been described as the business of buying and selling information as a commodity. Unlike traditional physical commodities, personal data is intangible yet holds immense economic value. The transformation of identity into a tradeable asset has occurred gradually as technologies for collecting and analyzing personal information have become increasingly sophisticated. [ . .. ] Personal identity in the digital realm comprises multiple elements. Demographic information includes age, gender, location, income levels, and educational background. Behavioral data tracks online activities such as websites visited, products viewed, and time spent on particular pages. Transaction histories reveal purchasing patterns, payment methods, and brand preferences. Location data from smartphones and wearable devices provides real-time information about movements and habits. What makes identity information particularly valuable is its predictive power. By analyzing past behaviors and preferences, companies can anticipate future actions with remarkable accuracy. This ability to forecast consumer behavior translates directly into competitive advantages in

---

[5]    https://www.ftc.gov/news-events/news/press-releases/2025/01/ftc-surveillance-pricing-study-indicates-wide-range-personal-data-used-set-individualized-consumer    (U.S.    Federal    Trade Commission Jan. 17, 2025) (last visited 3/09/2026).

marketing and product development. A complex ecosystem has emerged around the collection and trading of identity information. This marketplace operates largely invisibly to average consumers, yet it powers much of the modern digital economy. The global data brokerage industry was valued at approximately $270.4 billion in 2024, with projections indicating growth to $473.35 billion by 2032. [ . . . ] Advertisers and marketers purchase identity information to target specific consumer segments with tailored messages. Behavioral advertising uses internet cookies and tracking technologies to understand browsing tendencies and create defined audience segments. This allows companies to place advertisements in front of consumers most likely to respond positively.[6]

47.    There exists an established market for the type of personal data collected through TikTok Software on the Website: data that facilitates the creation and enhancement of consumer profiles for individuals, and ongoing tracking of individuals' internet browsing. Defendant's surreptitious and unlawful transfer of personal information to at least one third party diminished Plaintiff's ability to participate in that market on informed terms, including exercising the choice of whether to withhold, limit, or exchange her personal data for value.

G.    **Troubling Implications of Third-Party Data Sharing**

48.    Companies using third-party tracking software – such as the TikTok Software described above – often seek to downplay its significance. They emphasize that the data collected by such software is being used simply to inform consumers about products they believe would be particularly appealing to them.  However, there is no guarantee that consumer data supplied to social media platforms and data brokers will be used solely for advertising purposes.

49.    As Attorney General Bonta explained in the *Sephora* case:

The ramifications of this third-party surveillance can go beyond ordinary consumer profiling. Sephora's website allows visitors to

---

[6]   https://thelaw.institute/cyberspace-technology-and-social-issues/identity-value-modern-economy/ (The Law Institute (Updated) Oct. 27, 2025) (last visited 3/09/2026).

browse and purchase products such as prenatal and menopause support vitamins—data points which can be used by third-party companies to infer conclusions about women's health conditions, like pregnancy. Moreover, when a company like Sephora utilizes third-party tracking technology without alerting consumers and giving them the opportunity to control their data, they deprive consumers of the ability to limit the proliferation of their data on the web.

*Sephora* Complaint, at 2:14-20.

50.    A recent report by the Brennan Center, a public policy nonprofit, has explained that "government agencies may purchase personal data to further their exercise of coercive powers, including the ability to deport, arrest, incarcerate, or even use lethal force."[7]

51.    There are recent examples of tech companies exchanging information with the federal government in ways that threaten civil liberties and individuals with minority viewpoints. For example, U.S. Immigration and Customs Enforcement (ICE) has partnered with Palantir Technologies, a Denver-based software company, to use artificial intelligence and data mining to identify, track, and deport suspected noncitizens.[8]

52.    Another example of such government data exchange is the provision by Meta, pursuant to valid warrants, of user data such as Facebook messages, for the purpose of investigating and prosecuting state crimes related to abortion.[9]

53.    In February 2026, Google handed over user data to the United States Department of Homeland Security ("DHS" or "Homeland Security") based on an administrative subpoena for the investigation of an individual based on the fact that he had written to a DHS attorney advocating on behalf of a refugee from Afghanistan in deportation proceedings.[10]  No clear legal

---

[7] https://www.brennancenter.org/our-work/research-reports/closing-data-broker-loophole

[8]    https://www.americanimmigrationcouncil.org/blog/ice-immigrationos-palantir-ai-track-immigrants/ (last visited 2/6/2026).

[9]    https://www.nbcnews.com/tech/tech-news/facebook-turned-chat-messages-mother-daughter-now-charged-abortion-rcna42185 (last visited 2/6/2026).

[10]    https://newrepublic.com/post/206088/homeland-security-67-year-old-us-citizen-criticized-email (last visited 2/8/2026).

authority exists preventing the sale or dissemination of user data by data brokers to the federal government.

54.     The New York Times reported on February 13, 2026, "Homeland Security is said to have sent Google and Meta hundreds of subpoenas for information to identify Americans who oppose ICE. Tech companies received legal requests for the names, email addresses, telephone numbers and other identifying data behind social media accounts that track or criticize the agency."[11]

55.     In early March 2026, a news website reported about the existence of an U.S. Department of Homeland Security internal document revealing that Custom and Border Protection ("CPB") "bought data from the online advertising ecosystem to track peoples' precise movements over time …"[12]

## VI.     CLASS ALLEGATIONS

56.     Plaintiff brings this action individually, and on behalf of all others similarly situated (the "Class") defined as follows:

> **All persons within California who visited the Website during the applicable limitations period, and were subjected during their visits to the operation of the TikTok Software deployed on the Website.**

57.     This action has been brought and may be properly maintained as a class action. There is a well-defined community of interest in the litigation and the proposed class is ascertainable.

58.     NUMEROSITY: Plaintiff does not know the number of Class members but believes the number to be in the thousands, if not more. The exact identities of Class members may be ascertained by the records maintained by Defendant.

---

[11] *Homeland Security Wants Social Media Sites to Expose Anti-ICE Accounts* (N.Y. Times Feb. 13, 2026), available at https://www.nytimes.com/2026/02/13/technology/dhs-anti-ice-social-media.html (last visited 2/25/2026).
[12] *CBP Tapped Into the Online Advertising Ecosystem To Track Peoples' Movements* (404 Media Mar. 3, 2026), available at https://www.404media.co/cbp-tapped-into-the-online-advertising-ecosystem-to-track-peoples-movements/ (last visited 3/16/2026); *see also Security News This Week: CBP Used Online Ad Data to Track Phone Locations* (Wired Mar. 7, 2026), available at https://www.wired.com/story/cbp-used-online-ad-data-to-track-phone-locations/ (last visited 3/16/2026).

59.    COMMONALITY: Common questions of fact and law exist as to all Class members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

  a.  Whether Defendant's actions violate California common or statutory law;

  b.  Whether Plaintiff and Class members are entitled to statutory damages;

  c.  Whether Plaintiff and Class members are entitled to punitive damages;

  d.  Whether Plaintiff and Class members are entitled to injunctive relief;

  e.  Whether Plaintiff and Class members are entitled to the disgorgement of unlawfully obtained data; and

  f.  Whether Plaintiff and Class members are entitled to the disgorgement of profits.

60.    TYPICALITY: Plaintiff was subjected to the TikTok Software deployed on the Website when she visited the Website on August 24, 2025.  As a result, her data was transmitted to TikTok, and possibly other third parties, for fingerprinting, identification and tracking purposes. Her claims are therefore typical of the Class.

61.    ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff has retained attorneys experienced in class action litigation.  All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

62.    SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of each Class member is impracticable and inefficient.  Even if every Class member could afford individual litigation, the court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed and address identical issues.

## FIRST CAUSE OF ACTION

### Violations of the California Trap and Trace Law

### Cal. Penal Code § 638.51

63.     Plaintiff and Class Members reallege and incorporate each allegation in all preceding paragraphs contained herein.

64.     The California Trap and Trace Law provides that "a person may not install or use…a trap and trace device without first obtaining a court order…." Cal. Penal Code § 638.51(a).

65.     A "trap and trace device" is defined as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." § 638.50(c).

66.     The TikTok Software, as deployed on the Website, constitutes a trap and trace device under Cal. Penal Code § 638.50(c).

67.     The "electronic communication" at issue in this case is the communication between the devices of Plaintiff and the Class members, on the one hand, and the Website, an instrumentality of Defendant, on the other hand. "Electronic communication" is defined under CIPA as "any transfer of signs, signals, writings, images, sounds, data, or intelligence of any nature in whole or in part by a wire, radio, electromagnetic, photoelectric, or photo-optical system." Cal. Penal Code § 629.51(a)(2). A visit to a website entails the transfer of signals and data, or "intelligence of any nature" by a "wire, radio [or] electromagnetic [ . . . ] system." The interactions of Plaintiff and Class members with the Website meet this definition.

68.     The TikTok Software is designed to identify the source of the electronic communications between the devices of Plaintiff and Class members, on the one hand, and the Website, on the other, by 'capturing' the electronic or other impulses emanating from the devices that are "incoming" to the Website. The "*sources*" of the electronic communications moving from the devices to the Website are *Plaintiff and the Class members (including their devices and browsers)*.

17

69.     Software or code running on websites that "captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication" constitutes a trap and trace device for purposes of §§ 638.50-51.  *See, e.g., Nelson v. Reddit, Inc.*, 2026 U.S. Dist. LEXIS 32134, at *7-10 (S.D. Cal. Feb. 17, 2026); *Alex & Ani, LLC*, 2026 LX 10546, at *4-7 (C.D. Cal. Jan. 20, 2026); *Casillas v. Six Flags Ent. Corp.*, 2025 LX 518344, at *21-22 (C.D. Cal. Dec. 15, 2025); *Lewis v. Magnite, Inc.*, 2025 LX 509487, at *39-42 (C.D. Cal. Dec. 4, 2025); *Garon v. Keleops USA, Inc.*, 2025 LX 383838, at *10-15 (N.D. Cal. Sep. 2, 2025); *Valenzuela v. Intersystems Corp.*, 2025 Cal. Super. LEXIS 42550, at *3-4 (Orange Co. Superior Ct. Aug. 4, 2025); *Riganian v. LiveRamp Holdings, Inc.*, 791 F.Supp.3d 1075, 1093-1094 (N.D. Cal. July 18, 2025); *Gabrielli v. Motorola Mobility LLC*, 2025 U.S. Dist. LEXIS 133836, at *30-32 (N.D. Cal. July 14, 2025); *Price v. Headspace, Inc.*, 2025 Cal. Super. LEXIS 27951, at *3-9 (L.A. Super Ct. Apr. 1, 2025); *Sanchez v. Glasscanopy, Inc.*, 2025 Cal. Super. LEXIS 18460, at *8-9 (L.A. Super. Ct. Feb. 28, 2025);*Heiting v. Fka Distrib. Co.*, 2025 U.S. Dist. LEXIS 20076, at *8 (C.D. Cal. Feb. 3, 2025); *Conohan v. Rad Power Bikes Inc.*, 2025 U.S. Dist. LEXIS 72865, 2025 WL 1111246, at *16 (C.D. Cal. Apr. 3, 2025); *Mirmalek v. Los Angeles Times Commc'ns LLC*, 2024 U.S. Dist. LEXIS 227378, at *6-10 (N.D. Cal. Dec. 12, 2024); *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 930-931 (N.D. Cal. October 21, 2024);  *Moody v. C2 Educ. Sys. Inc.*, 742 F. Supp. 3d 1072, 1076-1077 (C.D. Cal. July 25, 2024).

70.     Defendant did not obtain a court order before using or installing the TikTok Software on the Website.  Defendant also did not obtain consent from Plaintiff or any of the Class Members before using this technology, which is designed to identify Plaintiff and the Class members, along with their devices, as the source of electronic communications between them, on the one hand, and the Website, an instrumentality of Defendant, on the other hand.

71.     Defendant did not obtain the express or implied consent of Plaintiff or Class members to be subjected to data-sharing or data-selling with or by or through TikTok.

72.     Defendant is ineligible for the statutory consent exemption from liability for use of a trap and trace device set forth in Cal. Penal Code § 638.51(b)(5).  The § 638.51(b)(5) consent

exemption is available only to a "provider of electronic or wire communication service." Defendant is not such a provider.

73.     Defendant's conduct violating § 638.51 caused Plaintiff and the Class members significant injuries. These injuries include: invasion of their legally protected privacy rights; their loss of control over personal identifying information due to Defendant's actions; the diminution in value of their data and identity; Defendant's unauthorized creation of detailed behavioral profiles of them; their mental anguish from knowledge of Defendant's secret monitoring; and chilling effects on their free online expression and inquiry due to Defendant's conduct, including causing the ongoing monitoring of their internet activity.

74.     CIPA imposes civil liability including statutory damages for violations of the California Trap and Trace Law. Cal. Penal Code § 637.2; *see also Fandom,* 754 F. Supp. 3d at 932; *C2 Educ. Sys. Inc.,* 742 F. Supp. 3d at 1077-78.

75.     Plaintiff and Class members are entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51.

## SECOND CAUSE OF ACTION

### Intrusion Upon Seclusion

76.     Plaintiff and Class Members reallege and incorporate each allegation in all preceding paragraphs contained herein.

77.     Under California law, a defendant is liable for intrusion upon seclusion when it intentionally intrudes into a private place, conversation, or matter in a manner that would be highly offensive to a reasonable person.

78.     Defendant's deployment of the TikTok Software on the Website intentionally intruded into a private conversation or matter Plaintiff and the Class members were involved in – namely their visit to the Website.  The intrusion allowed TikTok to identify, profile and track (on an ongoing basis) Plaintiff and Class members.

79.     Plaintiff and the Class members never authorized the third-party cookies and other tracking technology initiated by the TikTok Software on the Website.

80.     Plaintiff and Class members had an objectively reasonable expectation of privacy

with respect to their conversation or exchange with Defendant over the Website.

81.    Defendant's intrusion into Plaintiff's and Class members' visits to the Website was intentional in that it involved deployment of software and configuration of the Website.  Further, it was perpetrated for Defendant's economic benefit.

82.    Deployment of tracking software that engages in the type of identification, profiling and tracking carried out by the TikTok Software that Defendant installed on the Website forms the basis of an actionable intrusion upon seclusion claim under California law.  *See, e.g., Caldwell v. InMobi Pte., Ltd.*, No. 25-cv-09977-AMO, 2026 LX 229530, at *7-14 (N.D. Cal. Apr. 29, 2026); *Casillas v. Six Flags Ent. Corp.*, 812 F. Supp. 3d 1016, 1029-30 (C.D. Cal. 2025); *Krzyzek v. Openx Techs., Inc.*, No. 25-cv-05588-SI, 2026 LX 42961, at *10-13 (N.D. Cal. Jan. 27, 2026).

83.    The intrusion described herein would be highly offensive to a reasonable person.

84.    Defendant's intrusion upon seclusion caused Plaintiff and the Class members significant injuries. These injuries include: Defendant's invasion of their legally protected privacy rights; their loss of control over personal identifying information due to Defendant's actions; the diminution in value of their data and identity; Defendant's unauthorized creation of detailed behavioral profiles of them; their mental anguish from knowledge of Defendant's secret monitoring; and chilling effects on their free online expression and inquiry due to Defendant's conduct, including causing the ongoing monitoring of their internet activity.

85.    Defendant's invasion of the privacy of Plaintiff and Class members damaged them and they are therefore entitled to compensatory damages, which includes monetary damages.

86.    Plaintiff and Class members are entitled additionally to punitive damages because Defendant's use of the TikTok Software on the Website was malicious, oppressive and willful. That use includes both the installation of the code and the configuration of the Website to bypass what Plaintiff and the Class members believed were their decisions to stop all data-sharing and data-selling by the Website.  Defendant's actions were taken in conscious disregard of the choice made by Plaintiff and the Class members to stop the sharing with and selling to third parties of their personal data.

87.    Plaintiff and Class members are entitled additionally to equitable relief in the form

20

of enjoining Defendant from continuing to engage in its unlawful conduct, and disgorgement of profits earned by Defendant from its invasion of their privacy interests.

**PRAYER**

WHEREFORE, Plaintiff, on her behalf and on behalf of all the Class members, prays for the following relief against Defendant:

1.      An order certifying the Class, naming Plaintiff as the representative of the Class and appointing Plaintiff's attorneys as Class Counsel;

2.      An award of statutory damages pursuant to CIPA;

3.      An award of punitive damages;

4.      An award of nominal damages;

5.      An order for full restitution;

6.      An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

7.      An order enjoining Defendant's conduct as alleged herein and any other injunctive relief that the Court finds proper;

8.      Reasonable attorneys' fees and costs; and

9.      All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

DATED: Los Angeles, California
      June 12, 2026

TAULER SMITH LLP

By:   */s/ J. Evan Shapiro*
      J. Evan Shapiro, Esq.

J. Evan Shapiro
Robert Tauler
90 Broad St., Suite 703
New York, New York 10004
eshapiro@taulersmith.com
rtauler@taulersmith.com
(212) 702-8670 (New York office)
(213) 927-9270 (Main Office (L.A.))

*Attorneys for Plaintiff Sally Orr*

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.


DATED: Los Angeles, California            TAULER SMITH LLP
        June 12, 2026

                                            By:   */s/ J. Evan Shapiro*
                                               J. Evan Shapiro, Esq.

                                            J. Evan Shapiro
                                            Robert Tauler
                                            90 Broad St., Suite 703
                                            New York, New York 10004
                                            eshapiro@taulersmith.com
                                            rtauler@taulersmith.com
                                            (212) 702-8670 (New York office)
                                            (213) 927-9270 (Main Office (L.A.))

                                            *Attorneys for Plaintiff Sally Orr*